Motion to dismiss appeal denied November 30, 1943; argued
at Pendleton May 1; reversed June 6, 1944

## BENSON *v.* WILLIAMS ET AL.

(143 P. (2d) 477, 149 P. (2d) 549)

Before BAILEY, Chief Justice, and BELT, ROSSMAN, KELLY, LUSK, BRAND and HAY, Associate Justices.

*Teunis J. Wyers* and *George N. Davis,* both of Hood River, for the motion.

*Ira W. Carl,* of Portland, opposed.

KELLY, J. The salient allegations of plaintiff's complaint disclose:

That in June 1934, Karl Buelow, Elizabeth M. Buelow, his wife, and their daughter, Gertrude Benson, the plaintiff herein, were residing upon the real property in suit.

On July 5, 1934, Karl Buelow died testate having devised said real property to his wife, Elizabeth M. Buelow.

That shortly after the death of Karl Buelow an agreement was made between Elizabeth M. Buelow and plaintiff and plaintiff's fiance, Claron Benson, wherein Elizabeth M. Buelow promised and agreed to will said premises to plaintiff and build a new house thereon, and

in consideration therefor plaintiff and said Claron Benson agreed to move on to said property after their marriage to each other and care for same for said Elizabeth M. Buelow, tend the orchard, live on the premises and furnish all labor necessary for the care of said premises, including tractor and truck service, pay the fire insurance on the dwelling and other buildings, pay the taxes and water charges on the property and give said Elizabeth M. Buelow all the crops of fruit therefrom.

That plaintiff and Claron Benson were married on February 17, 1935, and about a week later moved on to said premises. That plaintiff and her husband fully kept and performed all the terms of said agreement until July 28, 1941, when a fire damaged the home on said premises to the extent that it became uninhabitable.

That said Elizabeth M. Buelow collected the money due under the insurance policy on said building.

That at the time of said fire it was further agreed that plaintiff and her husband would continue their agreement as aforesaid and permit Elizabeth M. Buelow to take the money coming due under said insurance policies in consideration for which, Elizabeth M. Buelow would not only leave them said property outright as previously agreed but within a short time she would construct on said premises a good modern home of convenient and suitable size and design for the use of plaintiff and her family.

That plaintiff and her husband have fully kept and performed the terms and conditions of said agreement as so modified.

That Elizabeth M. Buelow died on October 16, 1941.

That Elizabeth M. Buelow failed and neglected to construct a new dwelling on said premises as agreed; and also did not devise said realty outright to plaintiff.

That the cost of constructing a dwelling on said premises of convenient and suitable size for the use of plaintiff and her family is in excess of the sum of $5,000.

That the defendant William E. Williams has possession of the assets of the estate of said Elizabeth M. Buelow, deceased.

That the defendants claim some right, title and interest in and to the property in suit by virtue of a purported will of said Elizabeth M. Buelow, a copy of which is attached to plaintiff's complaint.

That said claim constitutes a cloud on plaintiff's title to said property. That the claim of the defendants is subsequent in time, inferior in right and subject to plaintiff's right to said property.

That the heirs at law of said Elizabeth M. Buelow have some interest in said property and said heirs at law are numerous and uncertain and Elfrida Wostl is one of said heirs at law and she is joined herein in her own individual capacity and as a representative of the other of said heirs to defend for herself and for the benefit of all other parties similarly situated and interested. That Frances Benson has an interest in said property as a child of plaintiff living at the time of plaintiff's death, and said Frances Benson is made a defendant herein to defend for herself and for the benefit of all other parties similarly situated and interested.

That William E. Williams and C. D. Nickelson are each appointed trustee by said will and they are joined as parties defendant as legatees thereunder and as purported holders of the legal title to said property pursuant to said will to defend as such trustees and for the benefit of all other persons who might acquire any

interest in and to said property by virtue of the provisions of said will.

The prayer in plaintiff's complaint among other things prays that a trust be impressed upon the property in favor of the plaintiff, that the plaintiff should be decreed to be the holder of a fee simple title to said premises, that the claims of the defendants should be held inferior in right, and subsequent in time to plaintiff's title to said premises, that the administrator of the estate of Elizabeth M. Buelow, deceased, should be required to pay to the plaintiff $5,000 in cash for the purpose of constructing a dwelling on said premises; and said prayer concludes with a plea for such other and further relief as to the court may seem meet and just.

The defendant, William E. Williams, as executor and trustee of the estate of Elizabeth M. Buelow, deceased, filed an answer to plaintiff's complaint consisting of one paragraph which, omitting the prayer, is as follows:

"The defendant admits that defendant Karl Buelow died testate on the 5th of July, 1934, and that on the 11th day of February, 1935, the plaintiff was married to Claron Benson, and that on the 17th day of December, 1935, a daughter was born to the plaintiff and her husband and that plaintiff's family, since then, has consisted of her husband, herself and said daughter, and that the plaintiff is 31 years of age and that her husband is 34 years of age. That the said Elizabeth Buelow died on the 16th day of October, 1941, and that she did not devise her real property to the plaintiff, nor construct a dwelling house on said property and the defendant has the possession of the assets of said Elizabeth M. Buelow estate with the exception as to disbursements made to date in the payment of her debts and in the administration of her estate and defendant

admits that a copy of her last will and testament is attached to the plaintiff's complaint and that there may be other children of plaintiff living at the time of plaintiff's death. That William E. Williams is appointed trustee under the said will of said Elizabeth M. Buelow, deceased.

"Save and except as herein admitted defendant denies each and every allegation in plaintiff's complaint."

By her will, a copy of which is attached to plaintiff's complaint, after giving her personal effects and $500 to her niece, Elfrida Wostl, Mrs. Buelow devised and bequeathed the residue of her estate affected by this proceeding in the following terms:

"The rest and residue of my estate both real and personal, I give to my trustees for the following uses and purposes:

(A) My daughter, Gertrude E. Benson, shall have the use of the farm property owned by me in Hood River County, State of Oregon, so long as she occupies the said property as a home and keeps the property in proper condition in the judgment of my trustees. All running expenses including water taxes, insurance and power must be paid by her.

(B) My trustees shall pay the sum of Thirty Dollars ($30.00) per month unto my daughter, Gertrude E. Benson, and if she shall ever become a widow or be required to support herself then and in that event my trustees shall pay her the sum of Sixty Dollars ($60.00) per month.

\* \* \* \* \* \*''

Said will also contains the following provision:

"The herein before established trust shall be determined at the time of the death of my daughter, Gertrude E. Benson, and at that time the rest and residue of my estate then in existence shall be conveyed to her children, share and share alike. In the event that my daughter, Gertrude E. Benson, be

without children surviving her, the entire rest and residue of my estate, both real and personal, shall descend to my heirs at law.''

Defendants Williams and Nickelson and C. C. Lindley were named in said will as trustees; but only defendants Williams and Nickelson qualified as such.

By the foregoing statement, it will be seen that this is a suit in equity to impress a trust upon specific real property belonging to the estate of a decedent to secure the value of services rendered decedent by plaintiff in caring for said real estate less the reasonable value of its occupancy, or for a decree declaring plaintiff to be the owner in fee of the premises in suit and depriving the trustees herein and their cestuis qui trustent except plaintiff of any right, title, claim or interest therein, and for damages by reason of the breach of decedent's agreement to construct a dwelling house for plaintiff on said premises.

The trial court treated the issue joined by appearing defendant upon the plaintiff's claim that the agreement alleged in her complaint had been made and that plaintiff was entitled to compensation because of plaintiff's performance thereof and also the issue upon plaintiff's claim that after the destruction by fire of the dwelling house on said premises, said agreement was modified as alleged in plaintiff's complaint to plaintiff's damage as an action at law and rendered separate findings thereupon.

On the same day that the issues last above mentioned were so determined by the trial court, namely on the 17th day of May, 1943, that court made a decree which was filed on May 18, 1943, in favor of plaintiff and contained the following terms:

''It is adjudged and decreed that a trust be, and the same hereby is impressed on the hereinafter de-

scribed real property in favor of the plaintiff and against the defendants and the plaintiff Gertrude Benson be and she hereby is declared to be the owner and holder of all the estate, right, title and interest heretofore held and owned by Elizabeth M. Buelow, deceased, during her lifetime in and to the following described real property situated in Hood River County, State of Oregon, to-wit: [Here follows a long description of real property copied from Exhibit A attached to plaintiff's complaint]."

On June 14, 1943, plaintiff, by her attorneys, filed a motion "for an order reopening the above entitled cause to the end that testimony may be offered to identify the land described in the decree heretofore entered in said cause on May 18, 1943, with that referred to in the testimony at the trial variously as the 'Buelow Place', the 'Home Place', etc."

On June 19, 1943, the trial court ordered the opening of said cause to take further testimony and vacated said decree.

On July 22, 1943, testimony was heard and an order was made by the trial court upon the motion of plaintiff authorizing the amendment of plaintiff's complaint by amending Exhibit A attached thereto.

We quote from the last mentioned order:

"* * * it appearing from the uncontroverted testimony entered herein that Exhibit "A" to the complaint comprises a larger tract of land than the one actually owned by the defendants but that said larger tract encompasses and includes the property described in the testimony as the 'Buelow Place' or 'Home Place' and it appearing that the ends of justice will be served granting said motion.

"It is hereby ordered that Exhibit "A" to the complaint for all of the future purposes of this case shall be considered amended to read as follows:

"[Here follows description]".

On said 22d day of July, 1943, a decree was rendered reciting that a default order had been entered against all defendants except defendant Williams and that on May 18, 1943, the court had made a decree, and on June 19, 1943, had ordered the reopening of said cause to take further testimony and had on said date vacated said decree and reopened the same for said purpose.

Said decree of July 22, 1943, was filed with the clerk of the trial court on July 23, 1943, and contained a further recital as follows:

> "It is adjudged and decreed that a trust be, and the same hereby is impressed on the hereinafter described real property in favor of the plaintiff and against the defendants and the plaintiff Gertrude Benson be and she hereby is declared to be the owner and holder of all the estate, right, title and interest heretofore held and owned by Elizabeth M. Buelow, deceased, during her lifetime in and to the following described real property situated in Hood River County, State of Oregon, to-wit: [Here follows description of real property as described in the amended Exhibit A of plaintiff's complaint]."

It is urged by plaintiff that there was a legal action instituted by the filing of plaintiff's complaint and also a suit in equity although both were contained in the same complaint. Based upon that contention plaintiff argues that as to the judgment of $4,000 rendered by the trial court in favor of plaintiff, appearing defendant's appeal should be dismissed because more than 60 days thereafter had elapsed before the service of defendant's notice of appeal.

■ We are unable to agree with plaintiff that more than one case was instituted by her when she filed her complaint herein. We think that the case so instituted is a suit in equity and that until all of the issues therein

were finally determined by the trial court, there was no order which would have the effect of determining the suit so as to prevent a decree therein.

By the provisions of the statute, there are only four orders which may be reviewed on appeal:

1. An order affecting a substantial right and which in effect determines the action or suit so as to prevent a judgment or decree therein.

2. An interlocutory decree in a suit for the partition of real property, defining the rights of the parties to the suit and directing sale or partition.

3. A final order affecting a substantial right and made in a proceeding after judgment or decree.

4. An order setting aside a judgment and granting a new trial.

Section 10-801, O. C. L. A., Vol 2, pp. 184, 185.

One of the material issues is whether there was an agreement between plaintiff and her mother which was thereafter modified to the effect that if plaintiff and her husband would continue to live upon the mother's property and care for it, pay the taxes thereon and make return to the mother of the fruit grown upon said premises; the mother would not only execute a will devising said property outright to plaintiff, but would construct a dwelling house thereon for plaintiff and her family to occupy.

There could be no final determination of that issue in an action at law to recover merely the damages caused by the mother's failure to construct the dwelling house. The remaining issue should be determined, namely, whether the agreement not only contemplated the construction of a new dwelling because the money derived from insurance upon the house destroyed had been diverted by the mother, but also contemplated and

required the execution of a will devising the property to plaintiff outright in consideration of services rendered as aforesaid.

■ The assertion in a suit in equity of a claim legal in its nature does not deprive the equity court of its jurisdiction unless the legal remedy is plain, adequate and complete.

Section 9-101 O. C. L. A., Vol. 2 p. 2.

■ The relief sought and granted by the trial court in this case could not have been given in a court of law. It is obvious, therefore, that the inclusion in her complaint of a claim for loss sustained by plaintiff on account of her mother's failure to construct a new dwelling house in place of the one destroyed by fire, did not have the effect of transforming this suit in equity into two cases, namely an action at law and a suit in equity.

As stated the original decree was vacated, then additional testimony was taken. Plaintiff was allowed to amend her complaint, and on July 22, 1943, a final decree was made.

Appealing defendant's notice of appeal was served and filed on August 6, 1943. Sixty days had not elapsed after the final decree was entered before the notice of appeal was served and filed.

The motion to dismiss defendant's appeal is denied.

***

Argued at Pendleton on the merits May 1; reversed June 6, 1944

ON THE MERITS

(149 P. (2d) 549)

Before BAILEY, Chief Justice, and BELT, LUSK, BRAND and HAY, Associate Justices.

*Ira W. Carl,* of Portland, for appellant.

*George N. Davis,* of Hood River (Teunis J. Wyers, of Hood River, on the brief), for respondent.

BAILEY, C. J. This suit was instituted by the plaintiff, Gertrude Benson, for the specific performance of an alleged oral contract whereby the plaintiff's mother, Elizabeth M. Buelow, now deceased, agreed to devise to the plaintiff certain real property belonging to the decedent in Hood River county and mentioned as the "home place", and to build thereon a house for the plaintiff.

According to the allegations of the complaint, Karl Buelow, father of the plaintiff and husband of Elizabeth M. Buelow, died on July 5, 1934, and at the time of his death he, his wife and the plaintiff were residing on the property involved herein. Shortly after his death Mrs. Buelow, upon learning that the plaintiff and Claron Benson were engaged to be married, proposed to them, the complaint continues, that if they would marry each other, live on the home place, "and furnish all labor necessary for the care of said premises, including tractor and truck service, pay the fire insurance on the dwelling and other buildings and pay the taxes and water charges on the property, and give" Mrs. Buelow "all the crops of fruit therefrom . . . she would will said premises to the plaintiff outright and build a new house thereon"; which offer was accepted by the plaintiff and Clara Benson. The plaintiff married Claron Benson on February 17, 1935, and with him moved onto the home place about a week later, where they resided continuously until July 28, 1941, when a fire damaged the house thereon to such an extent as to render it uninhabitable.

The complaint further alleges that at the time of the fire Mrs. Buelow agreed with the plaintiff that if the latter and her husband would continue with their agreement and would permit Mrs. Buelow to take the fire insurance money, she would leave the property to them and in addition would within a short time construct on the premises "a good, modern home of convenient and suitable size and design for the use of the plaintiff and her family", at that time consisting of her husband and one child born December 17, 1935; and that Mrs. Buelow did collect the insurance, the amount of which is unknown to the plaintiff, but failed and neglected to construct a new house on the home place. The plaintiff avers that she and her husband fully performed all the terms and conditions of their agreement with the plaintiff's mother.

Mrs. Buelow died testate on October 16, 1941. In her last will and testament, after making minor bequests, she devised and bequeathed the residue of her estate both real and personal "to my trustees for the following uses and purposes: (a) My daughter, Gertrude E. Benson, shall have the use of the farm property owned by me in Hood River county, state of Oregon, so long as she occupies the said property as a home and keeps the property in proper condition in the judgment of my trustee. All running expenses including water, taxes, insurance and power must be paid by her."

The last two numbered paragraphs of the will thus read:

## "VIII.

"The hereinbefore established trust shall be determined at the time of the death of my daughter, Gertrude E. Benson, and at that time the rest and residue of my estate then in existence shall be con-

veyed to her children, share and share alike. In the event that my daughter, Gertrude E. Benson, die without children surviving her, the entire rest and residue of my estate, both real and personal shall descend to my heirs at law.

"IX.

"I do hereby nominate and appoint C. D. Nickelsen to act as executor of this last will and testament and as trustee of the trust herein set up. If he be not living or able to serve at the time of my death, I do hereby appoint C. C. Lindley and if he be not living or able to serve at the time of my death, I do hereby appoint William E. Williams to act as executor and trustee under this last will and testament."

The plaintiff asks that she be declared to be the owner of the real property described in the complaint and that the executor of the decedent's estate be required to pay her "the sum of $5,000.00 in cash for the purpose of constructing a dwelling on said premises".

The caption of the complaint names as defendants William E. Williams as executor of the estate of Elizabeth M. Buelow, deceased, William E. Williams and C. D. Nickelsen as trustee legatees of said estate, Frances Benson and Elfrida Wostl. The complaint, which was filed on July 22, 1942, alleges that Mrs. Buelow died on October 16, 1941, but fails to allege that her will was admitted to probate or that any executor of the will or administrator of her estate was appointed. It does allege: "That William E. Williams and C. D. Nickelsen are each appointed trustee by said will and they are joined as parties defendant, as legatees thereunder and as purported holders of the legal title to said property pursuant to said will to defend as such trustees and for the benefit of all other persons who

might acquire any interest in and to said property by virtue of the provisions of said will." The name of C. C. Lindley, who was appointed by the will as an executor thereof and as trustee of the estate in the event that C. D. Nickelsen could not serve, is not mentioned as that of a defendant or referred to in the complaint, except in the copy of the will that is attached to the complaint as an exhibit. All the defendants named, with the exception of Frances Benson, were served with summons, and some of them also with copies of the complaint, in accordance with the directions of the plaintiff's attorney. C. D. Nickelsen made no appearance individually or as "trustee legatee." Elfrida Wostl likewise made no appearance. William E. Williams appeared as executor and trustee of the estate of Elizabeth M. Buelow, deceased, and filed an answer in which he denied the allegations concerning an oral contract between the decedent and the plaintiff and her husband, and defended on behalf of the estate and the beneficiaries named in the will.

Frances Benson, named as defendant, was a minor between six and seven years of age at the time that the suit was instituted, and was not served with either summons or complaint. After the institution of the suit her father, Claron Benson, petitioned the court to be appointed as her guardian *ad litem* and was so appointed. Thereafter he noted on the summons which had previously been filed his acceptance of service thereof as guardian *ad litem* of the defendant Frances Benson. He made no appearance in that capacity, however, on behalf of his daughter. And the plaintiff relied principally upon his testimony in corroboration of her own, to support the allegations of her complaint.

Judgment was entered by the circuit court in favor of the plaintiff and against the executor of the estate for the sum of $4,000, also a decree declaring the plaintiff to be "the owner and holder of all the estate, right, title and interest heretofore held and owned by Elizabeth M. Buelow, deceased, during her life time in and to" the real property here in controversy. From that judgment and decree William E. Williams as executor and trustee has appealed.

■ The appellant raises in this court for the first time the question of the plaintiff's failure to allege that the will of the decedent had been admitted to probate and that an executor of such will had been appointed by the court. Nevertheless, his answer as executor and trustee of the estate has supplied that deficiency in the complaint. We shall assume, inasmuch as he appeared in both capacities in the circuit court, apparently without objection, that the will has been admitted to probate and that he is the duly appointed, qualified and acting executor and trustee under the decedent's will. This assumption is confirmed by the following statement, appearing in his brief on appeal: "Said will was admitted to probate in the county court of the county of Hood River and the appellant was appointed executor and on July 13, 1942, the county court by its order entered on said date transferred said probate proceedings to the circuit court of said county."

■■ Section 1-605, O. C. L. A., provides that summons shall be served upon a minor under the age of fourteen years by delivering a copy thereof to the minor personally and also a copy to such minor's father, mother or guardian, "or, if there be none within the state, then to any person having the care and control of such minor." In the case before us the requirement of

the statute as to delivering a copy of the summons to the minor was not observed, and it is doubtful whether the attempted acceptance of service by her guardian *ad litem* was of any effect whatever: *Harris v. Sargeant,* 37 Or. 41, 60 P. 608; *Cobb v. Klosterman,* 58 Or. 211, 114 P. 96. Moreover, we can commend neither the procedure of a father who has himself appointed guardian *ad litem* of his child when his interest in the litigation is adverse to that of the child, nor his failure to file an answer on behalf of the child.

■ In view of the facts we are of the opinion that Frances Benson, the minor child of the plaintiff and her husband, was not a necessary party to this litigation. She has no present vested interest in the real property in suit. All that she has is a future contingent interest. It is only by outliving her mother that any interest in the property may vest in her, according to the provisions of the will. The fee simple title to the property is, by the will, vested in William E. Williams as trustee. To the effect that Frances Benson was not a necessary party to this suit, see: *American Bible Society v. Price,* 115 Ill. 623, 5 N. E. 126; *Temple v. Scott,* 143 Ill. 290, 32 N. E. 366; *Green v. Grant,* 143 Ill. 61, 32 N. E. 369, 18 L. R. A. 381; *Townshend v. Frommer,* 125 N. Y. 446, 26 N. E. 805, 811; *Montgomery v. Equitable Life Assurance Society,* 83 F. (2d) 758, 762. See also, in this connection: *Edwards v. Harrison,* (Mo.) 236 S. W. 328; *Brickell v. Lightcap,* 115 Miss. 417, 76 So. 489; *Bennett v. Garlock,* 79 N. Y. 302, 35 Am. Rep. 517.

By his answer and defense the defendant contested to the utmost the merits of the plaintiff's claim. He did everything that could possibly be done to protect

the interests of creditors of the estate, the legatees under the will and the contingent remaindermen.

■ The plaintiff does not set forth in her complaint that she had, prior to the institution of this suit, submitted to the executor of the estate her claim of right to the real property involved herein or any claim for .money due from the estate to her because of the failure of the decedent to perform the alleged oral contract. That omission apparently was not called to the attention of the trial court until the defendant presented his proposed findings of fact at the conclusion of the hearing. The defendant did not demur to the complaint or move to have it made more definite and certain. Nor did he object to the introduction of evidence on the ground of any deficiency in the allegations of the complaint. From the record before us it is impossible to determine whether the plaintiff's claim was or was not presented to the executor. Whether or not §§ 8-912, 19-703 and 19-704, O. C. L. A., contemplate that a claim of this nature should be submitted to the executor or administrator *(Harris v. Craven,* 162 Or. 1, 91 P. (2d) 302), the defendant by filing his answer and going to trial on the merits without raising objection waived any deficiency of the allegations in that respect: *Bramwell v. Heseltine,* 122 Or. 519, 259 P. 1063; *Morgan's Estate,* 46 Or. 233, 77 P. 608, 78 P. 1029.

The real property which is the subject of this litigation consists of approximately twenty-seven acres, situated a short distance from the city of Hood River. A part of it, about twelve acres, is in pear and apple orchard. The remainder of the land is uncultivated and is covered with brush and swamp. In the testimony the property is referred to frequently as the home place, probably because it was the home of the

plaintiff and her parents until her father's death in 1934.

The plaintiff had assisted her father in taking care of the property and as a result of her work had accumulated some $1,500 or $1,600 at the time of her marriage to Claron Benson. Upon her father's death her mother was unable to look after the farm property and wished to move into an apartment building that she owned in Hood River. During the month of October, 1934, the decedent suggested to the plaintiff, who was then unmarried, and to Claron Benson, to whom the plaintiff was engaged, that if they would marry and live on the home place, she would, according to the plaintiff's testimony, "give us the property, providing that we kept it free from expenses, paid all taxes and water and all concurring operating expenses that would come from year to year, and my faithful promise was that we would keep the place free from debt." The plaintiff also testified as follows concerning the same matter:

"Q. And did you also say anything as to carrying on the operation of the place, as to running the place?

"A. That we would run it for her.

"Q. Did she say anything further as to any division of the proceeds at that time?

"A. We were supposed to receive half.

\* \* \*

"Q. [By the court:] What did she say about it?

"A. That we were to receive half of the proceeds.

"Q. [By Judge Davis, plaintiff's counsel:] After all the expenses of operation were taken out?

"A. Yes, sir.

\* \* \*

"Q. Was there anything said about the house at the time you were meeting in the kitchen, you were sitting around the table in the kitchen?

"A. She said she knew that it was rather a poor house, but if we could get along in it for a few years, in time she would build us a new house."

The plaintiff further testified that after the second year's crop was harvested, she and her husband prepared a statement of the disbursements made by them in the operation of the property up to that time, and her husband submitted it to her mother; that she had asked her mother several times for the return of the statement, of which no copies had been made, and her mother each time stated that she would bring it "next time she came"; but that she never did return it to the plaintiff or her husband. After testifying that her mother had received all the proceeds from the sale of crops and that the Bensons had not received their portion thereof, the plaintiff thus testified:

"Q. When were you to get any of it—were you to get any of it?

"A. Yes, we were to get—we were supposed to get half the proceeds.

"Q. Didn't you protest against that? Didn't you take it up with your mother, find why you didn't get it, after that happened once didn't you ask her?

"A. No, I didn't ask her.

"Q. You didn't ask her. Did your husband?

"A. Not that I know of. I don't recall, I wasn't with him every time.

"Q. You don't know that he did?

"A. I couldn't say that he did or didn't; I am not sure.

"Q. Didn't it occur to you during those four or five or six years that you turned the proceeds over to her? Did she get the proceeds each year

from the time you were married up until the time of her death?

"A. Yes.

"Q. At no year during that period of time did you get your half?

"A. No, sir.

"Q. So far as you know she was never asked why?

"A. No; because I figured that she would leave the place to me in the end.

"Q. Is that the reason you didn't ask?

"A. Mainly, yes.

"Q. Was there any other reason?

"A. I can't recall of it now.

"Q. Is it possible there was some other reason?

"A. That I couldn't say.

\* \* \*

"Q. Was she [Mrs. Buelow] to make any improvements herself in the meantime on the place? Was she to pay out anything at all?

"A. I don't recall. I can't answer that question.

"Q. When you say half of the proceeds, was that to be the net proceeds? If you can't understand what I mean by that, say so. Put it this way: Were all the operating expenses to be first deducted before these proceeds were to be divided, or were you to give her half of everything you got off the place?

"A. The expenses were to be paid.

"Q. Out of the proceeds?

"A. Out of the proceeds of the place.

"Q. And if there was anything left you were to divide it, is that right? Is it?

"A. That is the way I understand it."

Claron Benson gave his account of the agreement between Mrs. Buelow and the Bensons as follows:

"Q. You heard your wife testify about the occasion in the kitchen of your home about a week after this?

"A. Yes.

"Q. Will you tell the court your version of what took place there?

"A. Well, she wanted to know again when we were going to get married, if we would go ahead and get married.

\* \* \*

"Q. Then it was that she asked you when you were going to get married?

"A. Yes, she did.

"Q. What did she say then, if you remember?

"A. Well, she said that if we went ahead and got married and we took care of the place and paid all the expenses, which would include taxes and water, insurance, additional labor, fertilizer, and such as that, that she would give us one-half of the net.

"Q. What about the place in the end?

"A. And that we would get the place in the end.

"Q. What did she say about building a house at that time?

"A. She said again at that time that she would see that we had a new house to live in; that the prices of fruit were not exactly satisfactory at that particular time and that she would see when prices picked up a little bit that we had a new home there.

\* \* \*

"Q. Now, do you remember an occasion when you and your wife made up a statement of expenses?

"A. Yes, I do. We made up a complete statement of all the expenses that we had paid out during that first year of operation.

"Q. The first two years of the crop, the two crop years 1935 and 1936?

"A. Yes; and I took it down to her [Mrs. Buelow] so she could see how we stood. She hadn't said anything about our percentage on the crop and she suggested that I leave them there and she would look them over, which I did. She said at that time, she says, 'You folks will get the place anyway.'

"Q. Did you ever get the statement back?

"A. No, I never; trusted her for it, but Gertrude asked her for it a time or two, but she always said she would bring it at the next time she came, but she never done so.

\* \* \*

"Q. I think it would be well for you to explain to the court. If your mother-in-law at one time said she was going to give you one-half the proceeds, why didn't you press for that money?

"A. Well, I didn't want to cause any trouble between my wife and her."

Mr. Benson stated that Mrs. Buelow gave him $150 at the time he took the statement to her; and that $150 amounted to only about one-eighth of the net proceeds for each of the two years 1935 and 1936. He further stated that he took up with Mrs. Buelow three or four times the matter of her paying one-half of the net proceeds to himself and his wife, but finally decided that she might as well keep all the proceeds and that, "we thought we would get the place for our pay like she promised she would give it to us." His further testimony in this connection is as follows:

"Q. You were to forego these proceeds, your half of the net proceeds, is that right?

"A. Yes, I didn't want to disturb any feeling between my wife and her mother, cause any trouble; if I would have pressed for that money [it would] probably stir up 'remains' and I didn't want to stir up any 'remains'.

"Q. Why did you think it would stir up 're-mains' if it was right?

"A. Because I knew how she liked to hang on to her money.

"Q. One-half of it was your money?

"A. Supposed to have been.

"Q. Would she refuse to talk reason about these things?

"A. All she would say is, 'You will get the place anyway.'

"Q. And you were content to wait?

"A. Well, I was to a certain extent. I wasn't content in my own mind."

The house on the home place was partially destroyed by fire on July 28, 1941. When Mrs. Buelow was looking over the damage, in company with an insurance adjuster and a carpenter, Mr. Benson heard her exclaim: "My God! I might as well build a new house." That remark was construed by Mr. Benson as a conclusion that the old house was not worth repairing.

In regard to what her mother had said about repairing the house after the fire, the plaintiff gave the following testimony:

"Q. When the house out there was burned, what did you ever hear your mother say about the building of a new house at that time after the house was burned?

"A. She asked us if it would be a profitable thing to repair the old house, and I told her that I didn't think it would, because it had no foundation under it, and with the water that had been put on there from the fire, that had gone down between the walls, it had gone into the little old cellar down there and had weakened the underpinnings of the house; and I told her that I didn't quite think it was profitable for her to spend any money on an old house like that. And she said, well, she didn't think so either, that she thought it would be profitable in placing a new house there."

On two or three occasions during the last two years of her life Mrs. Buelow discussed with her daughter and

son-in-law the matter of building a new house on the home place. Mr. Benson told the decedent that he would be willing to pay for the lumber for a new house by hauling logs for the mill, and that he would dig the basement and assist otherwise in the construction of the house. He stated that the house, before the fire, "wasn't worth very much; it was livable"; and that it was worth practically as much after the fire as before it.

With reference to the value of the real property here involved, Mr. Benson testified as follows:

"Q. What would you say this was worth before this house burned?

"A. Oh, as a business, from a business standpoint, money-making proposition, it is not worth too much. I don't believe a person could hardly make a living on the place. I know the Buelows they had that tailor shop to help out, and I had my tractor work to help out. You can start from town and go all the way out past there and pretty near everybody on those small places like that got a job on the outside, helping to do something to make it pay. It is not worth more than a couple of thousand dollars, I would say.

"Q. Before the fire?

"A. Before or after; the house wasn't worth [much], even before it burned, just sticking there in the dirt. It had six or eight kinds of rustic on it, boards up and down, underneath in some places."

From the time that the Bensons moved upon the home place until October, 1936, Mr. Benson spent practically all his time working on the place, but after that month he sought employment elsewhere, and during the remainder of the year 1936 he earned about $265. In the spring of 1937 he bought a tractor and thereafter he "worked on the place off and on" when

he had time; and "when I was away," he testified, "working on my tractor, and couldn't be on the place when things needed attention, I hired a man to take my place." In June, 1937, Mr. Benson bought a truck, which he used for transporting his tractor and for other purposes.

The record is silent as to how much time Mr. Benson devoted to the home place after October, 1936, or how much he paid for labor. He testified that the expenses which he and Mrs. Benson paid in the operation of the farm from 1935 until Mrs. Buelow's death amounted on the average to $700 a year; and that those disbursements should have been deducted from the proceeds of the farm crops. He also stated that after deducting such expenses the net proceeds from the operation of the farm would average from $1,000 to $1,200 annually, with the exception of two or three years. As to the fire insurance, he testified that "evidently" Mrs. Buelow collected some insurance, but he did not know how much. He did not state, nor is there any evidence, that the Bensons made any permanent improvements on the real property.

About one or two years after the Bensons were married, Mrs. Buelow stated to Mrs. Munroe, the latter testified, that "the place is theirs [the Bensons'] now just as much as it will be when I am gone."

Mr. H. F. Morse, who was a salesman for the Ideal Grader and Nursery Company, testified concerning negotiations he had with Mrs. Buelow in 1936, or about that time, in regard to the installation of a spray pump. After the installation had been completed he informed Mrs. Buelow that the power plant was not efficient, which "very much upset" her, and she exclaimed: "By God! That is the way it goes, when you are buying

a thing you are stuck with it." Later in the conversation she said, according to this witness, "well, it does not make any difference. I suppose it will all go to Gertrude anyway."

On March 3, 1941, Alva Day discussed with Mrs. Buelow the question of putting in new pipe for the irrigation system, and it was the opinion of both of them that the replacement of the old pipe by a larger one would lessen the operating expenses. It was then, according to Mr. Day's testimony, that Mrs. Buelow "made the statement that Gertrude would eventually have everything she [Mrs. Buelow] had and that they [the Bensons] could figure out the operation of that place to suit themselves after she was gone, but while she was here she was going to be boss."

George Pflughaupt, a former employee of Ideal Grader and Nursery Company, stated that in March, 1941, Mrs. Buelow said to him with reference to payment for the pipe: "I feel that Clare should pay for this. I don't think I should be expected to pay for this pipe, because the place belongs to them, or will belong to them when I am gone." The evidence does not show that Claron Benson did pay for the pipe or that Mrs. Buelow ever asked him to pay for it.

Another witness, Mrs. Beltz, stated that Mrs. Buelow told her shortly before she died: "I am not going to keep that ranch; I won't bother with it; I am going to deed that over to the children and let them have it; I won't be worried with it."

The last of the witnesses called by the plaintiff in corroboration of her testimony and that of her husband as to the existence of a parol agreement between them and Mrs. Buelow was Mrs. Edling. This witness stated that she had talked with Mrs. Buelow on October 8,

1941, eight days before the latter's death. Concerning that conversation she gave the following testimony:

"Q. Did Mrs. Buelow at that time ask you anything on the question of whether she should remodel the old house or build a new one?

"A. Yes, she asked my opinion, what I would do. I told her I would build a new one, for the old house didn't have no foundation, and she said she came to the same conclusion."

Mrs. Edling also testified as follows:

"Q. Do you remember the occasion when some rock gardens were being put in out at the place by Mr. Benson and his wife, the plaintiff in this case?

"A. Yes. She did wonderful work in the rock gardens. And she says, well, he can do a better job when he works for himself, but it is just like working for himself because it is his own place anyhow."

The will which the plaintiff seeks to defeat in so far as it affects the home place was executed by Mrs. Buelow on September 13, 1940, and it is to be borne in mind that by the provisions of the will the home place is given to the trustee on the condition that the plaintiff have the use of the property so long as she occupies it as a home, keeps it in "proper condition" and pays expenses connected with the operation of the place. The testimony of at least four of the plaintiff's witnesses above mentioned had reference to conversations with Mrs. Buelow after the date of the execution of her will.

Mrs. Buelow's estate was appraised at a value in excess of $41,000 and consisted of property in the states of Oregon and Washington. The appraised value of the home place is not disclosed. Mrs. Benson is the only child and heir-at-law of the decedent. The will in question, in addition to giving Mrs. Benson the use of the home place, also provided that the trustee should

pay her $30 a month and that if she should "ever become a widow or be required to support herself," such payment should be increased to $60 a month.

In the will of her father Mrs. Benson was bequeathed $1,000. About six months after his death she asked Mrs. Buelow, the executrix of that decedent's estate, for her legacy, and was told that it would be paid to her when the estate was closed. She never again asked her mother for it and had not received the money at the time of her mother's death. Mrs. Benson stated that she did not know why she had not again requested the payment of her legacy.

From the time that Mrs. Buelow moved into an apartment in Hood River until her death she took numerous trips, some of them lasting for two or three weeks. She would seldom tell the Bensons that she was going away or make known her destination, or upon her return inform them about her trip. While she was away she did not write letters to them. Even after moving into town, Mrs. Buelow kept a close supervision of the operation of the home place.

 An agreement to devise real property by will is within the statute of frauds (§ 2-909, subdivision 6, O. C. L. A.), which requires every contract for the sale of realty to be in writing; and a parol promise to devise land is invalid and unenforceable unless there has been a sufficient part performance to take the contract out of the statute, so as to permit its enforcement in equity: *Richardson v. Orth,* 40 Or. 252, 66 P. 925, 69 P. 455; *Mathews v. Tobias,* 101 Or. 605, 201 P. 199; *Lewis v. Siegman,* 135 Or. 660, 296 P. 51, 297 P. 1118; 49 Am. Jur., Statute of Frauds, § 215, page 539. Before a court of equity will decree specific performance the contract must be established by clear, satisfactory and convinc-

ing evidence; and its terms must be just, reasonable and mutual: *Hunter v. Allen, ante* p. 261, 147 P. (2d) 213; *Losey v. O'Hair,* 160 Or. 63, 83 P. (2d) 493, and authorities therein cited. The annotator in 106 A. L. R., at page 748, thus describes the attitude of courts toward parol agreements to devise or bequeath property:

> "A proceeding for the specific enforcement of a contract to devise or bequeath the property of the promisor, being an effort, by a contract resting in parol, to distribute the estate of a deceased person in a different way from that provided by law, has uniformly, together with the evidence relied upon to establish the contract, been looked upon with jealousy, and the evidence to establish it will be weighed in the most scrupulous manner."

See also, in this connection, *Stever v. Holt,* 164 Or. 195, 212, 100 P. (2d) 1016, wherein it is said that such contracts "are viewed with suspicion and distrust".

The part performance relied upon to take out of the statute of frauds an agreement to devise land must place the promisee in such a situation that it would be a fraud upon him if the agreement were not enforced: *Mathews v. Tobias,* supra; *Holsz v. Stephen,* 362 Ill. 527, 200 N. E. 601, 106 A. L. R. 737. When the conveyance is promised in consideration of services to be performed, it must appear that the services are of such exceptional character or of such peculiar value that they can not be adequately compensated at law: *Losey v. O'Hair,* supra; *Holsz v. Stephen,* supra.

In the instant case the complaint alleges that the decedent promised that she would devise the home property to the plaintiff, if the plaintiff and her husband would reside on the premises, furnish all labor and supplies for the care of the same, pay all expenses

thereon, including taxes, insurance and water charges, and permit her, Mrs. Buelow, to have all the crops of fruit grown on the place; that the Bensons accepted the offer; and that they fully performed their part of the agreement. The evidence does not support those allegations of the complaint. In fact, it proves that there was no such agreement as averred in the complaint. The testimony of both the plaintiff and her husband is to the effect that the agreement was that all the expenses connected with the operation of the home place were to be paid out of the proceeds of the crops and that the Bensons were to receive one-half of the net proceeds realized from the operation of the home place. That Mrs. Buelow did not reimburse them for the expenses they paid and give them one-half the net proceeds does not alter the situation. There is no contention here made by the Bensons that the original agreement between them and Mrs. Buelow as testified to by them was later modified to conform to the allegations of the complaint.

It is asserted in the complaint that after the fire partly destroyed the house on the home place Mrs. Buelow agreed, in consideration of the Bensons' permitting her to have the insurance money and continuing with the alleged contractual arrangement, that she would construct on the premises a modern home for the use of the plaintiff and her family. There is not one iota of evidence in the record that any such agreement was made. There is not even any proof that Mrs. Buelow received one cent of insurance money. And if any payment had been received by her for the fire loss, it could not have amounted to much, if we are to believe the testimony regarding the type of house that was damaged by fire.

Mrs. Buelow did from time to time talk about building some kind of house, but from the remarks she made to both the plaintiff and her husband and to others after the fire it is obvious that she did not feel obliged to build any house at all. Moreover, in regard to the alleged promise to build a house, the evidence as to the class or type of structure that she might have been considering, or its cost or size, is too meager and too vague to establish an enforceable contract.

No attempt has been made by the plaintiff to show that the services that she and her husband rendered Mrs. Buelow were of such an unusual character or such a peculiar value that the Bensons can not be adequately compensated therefor in money. Moreover, there is no showing that one-half of the net proceeds from the fruit crops, which one-half averaged from $500 to $600 annually with the exception of two years, and the use of the house on the home place would not be reasonable compensation for the services which they rendered. Mr. Benson testified that after the first two years he had earned enough money by working away from the place to support his family, purchase a tractor and truck, and in addition pay some $700 a year for expenses connected with the home place, for which expenditures he was to be repaid out of the income from the place.

Mrs. Buelow is not here to give her version of the transaction. The provisions of her will, however, are inconsistent with the promises attributed to her by the Bensons. Many of her acts also, as testified to by them and by other witnesses, negative the plaintiff's contentions. Not any of the witnesses called by the plaintiff testified that Mrs. Buelow had stated or indicated to them that she had an agreement whereby she was to leave the home place to her daughter or to her and

her husband. No doubt the plaintiff, as the only child of the decedent, expected that her mother would leave a substantial part of her estate to her. She did not care to antagonize her mother by insisting that the latter pay the $1,000 legacy left her by her father, repay her and her husband what they had expended in operating the home place, or pay them for their services.

The evidence in the case, as we have hereinbefore stated, fails to prove the allegations of the complaint. Were we to consider the complaint as amended to conform to the proof, we should still have to hold that the evidence does not clearly, satisfactorily and convincingly show a situation warranting a court of equity to decree specific performance. The decree appealed from is therefore reversed. The suit is dismissed without prejudice to any legal or equitable claim that the plaintiff and her husband may have against the decedent's estate for expenditures made or labor performed by them on the home place. We do not here decide, however, whether there was or was not an agreement between Mrs. Buelow and the Bensons providing that the latter should have one-half the net proceeds of the crops.

Neither party shall recover costs in this court.